UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
SEP 01 2006
EUGENE R. WEDOFF
BANKRUPTCY JUDGE

In re:                                    )
                                          )   Case No. 06 B 01853
    Aaura, Inc.,                          )
                                          )   Chapter 11
        Debtor.                        )
_____)

## MEMORANDUM OF DECISION

This Chapter 11 case is before the court on two matters brought by the debtor in possession, Aaura, Inc. The first is an objection to a claim filed by Sovereign Precious Metals, LLC ("Sovereign"). The second is a motion for the use of cash collateral. The matters are related: to use cash collateral, Aaura must adequately protect the interest that Sovereign has in that collateral, securing its claim against Aaura. That claim, in turn, arises out of an agreement that is nominally a consignment, but is effectively a secured loan of gold. Aaura's objection claim is resolved, as required by § 502(b) of the Bankruptcy Code (Title 11, U.S.C.), by valuing Sovereign's claim in United States dollars as of the date of Aaura's bankruptcy petition. Because the value of gold has increased since the petition date, an equity cushion has been generated that provides adequate protection for this claim. Accordingly, Aaura's motion for the use of cash collateral will be granted.

### Jurisdiction

District courts have exclusive jurisdiction over bankruptcy cases pursuant to 28 U.S.C. § 1334(a), and they have concurrent jurisdiction over all civil proceedings "arising in" bankruptcy cases pursuant to 28 U.S.C. § 1334(b). Claim objections and motions to use cash collateral "arise under" the Code and so are within the district court's jurisdiction. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("Congress used the phrase 'arising under

title 11' to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11.").

Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has referred its bankruptcy cases to the bankruptcy court of this district. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. Proceedings "arising under" the Bankruptcy Code are core proceedings, *Wood*, 825 F.2d at 96, and claim objections and requests for use of cash collateral are expressly included in a statutory list of core matters. 28 U.S.C. §§ 157(b)(2)(B), (M). This court accordingly may enter final judgments on the pending matters.

## Background

Aaura imports gold jewelry and sells it on the wholesale market. On October 14, 2004, Aaura entered into two agreements—a Consignment Agreement and a Security Agreement—with Sovereign. Under the Consignment Agreement, Sovereign agreed to deliver gold to Aaura in amounts not to exceed a defined percentage of Aaura's total inventory of gold. The gold delivery could take place either by actual shipment to Aaura's principle office or by Sovereign's crediting to Aaura's account gold held by a third party. Aaura could elect to purchase the gold from Sovereign at the daily market price and upon termination of the agreement was obliged either to return any unpurchased gold or pay its then market value to Sovereign. The agreement was terminable by Sovereign at will. However, while the agreement was outstanding, Aaura could simply retain the delivered gold without purchasing it. Any amount of gold that had been delivered but not purchased would accrue fees daily, based on a percentage of the market value of the gold. Aaura bore all risk of loss, theft, damage, or destruction of the gold. Title was to remain with Sovereign until it received payment, but in the event

that a court found that title to the gold actually passed to Aaura under the Consignment Agreement, the Security Agreement provided that the gold was to be collateral for all of Aaura's obligations to Sovereign—including the obligation to return the gold or pay its value to Sovereign.

The undisputed practice of the parties is somewhat different than the terms of the Consignment Agreement might suggest. Sovereign did not continually supply gold that Aaura then sold to customers. Instead, Aaura had a revolving stock of merchandise supplied by other sources. Although the agreement purports to require Aaura to pay for any of Sovereign's gold that Aaura sold, in reality it could buy and sell its merchandize at will—provided that it kept its inventory at a level sufficient to repay its obligation to Sovereign.

As of the petition date, February 28, 2006, Sovereign had consigned 5,000 Fine Troy Ounces ("FTO") of gold to Aaura. The price of gold on that date was $556 per ounce. Since the petition date, the price of gold has risen substantially. As of the date of this opinion, the spot price for gold bullion was approximately $625 per ounce. See http://www.forbes.com/home/feeds/afx/2006/08/31/afx2985508.html (last visited on August 31, 2006).

## Discussion

Aaura seeks to use its cash and cash equivalents in the continued operation of its business. Under the Security Agreement, Sovereign has an interest in those assets, rendering them "cash collateral" under § 363(a) of the Code. Before a debtor in possession may use cash collateral, each entity with an interest in the assets must consent, or, absent consent, the court must authorize such use, pursuant to § 363(c)(2). The court, in turn, may authorize use of cash collateral under § 363(c)(2)(B) and (e) if, after notice and a hearing, it determines that the secured creditors' interests in the cash collateral will be adequately protected. Sovereign

3

has not consented to Aaura's use of cash collateral. Therefore, Aaura must establish that Sovereign's interest in the cash collateral is adequately protected.

Aaura asserts that an equity cushion—an excess of collateral value over Sovereign's claim—provides adequate protection. An equity cushion may indeed provide adequate protection. *See In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992); *In re Markos Gurnee Partnership*, 252 B.R. 712, 716-17 (Bankr. N.D. Ill. 1997). Most of the equity cushion asserted by Aaura is based on the appreciated gold in its possession.

Sovereign disputes this equity cushion. Sovereign asserts (1) that it, rather than Aaura, owns the bulk of the gold currently in Aaura's possession, and (2) that its claim has been growing as the price of gold has increased. Neither of these assertions is correct.

*Ownership of the gold.* First, Aaura does in fact own the gold that is involved in the Consignment Agreement. Rhode Island law governs here.[1] The parties did not cite, nor was the court able to find, any relevant Rhode Island decision regarding ownership of goods subject to an agreement like this one. However, there is no reason to believe that Rhode Island would depart from the common law of consignments or that Rhode Island courts would interpret the Uniform Commercial Code, which Rhode Island has adopted, in a way materially different from other courts.

The arrangement between Sovereign and Aaura was not a true consignment because Aaura did not act as an agent of Sovereign. As a general matter, a consignment is bailment coupled with agency. Consigned goods remain the property of the consignor and are entrusted to the consignee under the consignor's continued direction, usually for sale to a third

---

[1] Illinois' choice of law rules apply. *Klaxon co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941). Illinois law allows parties to agree that a particular state's law will govern their contract as long as there is a reasonable basis for their choice. 810 Ill. Comp. Stat. 5/1-105 (2001). The Consignment Agreement stipulates that Rhode Island law applies. Sovereign's office of record in the contract is in Rhode Island, and Aaura has not suggested that the choice is unreasonable.

4

party. *See Sturm v. Boker*, 150 U.S. 312, 326 (1893) (giving an example of such a consignment). This contrasts with a situation in which goods are transferred to a "consignee" while the "consignor" retains title only to secure payment of an obligation—an arrangement in which the nominal consignment is in effect a security arrangement. *See* Ingrid Michelsen Hillinger, *The Treatment of Consignments in Bankruptcy: Two Codes and their Fictions, At Play and in the Field*, 6 Bankr. Dev. J. 73, 74-75. The UCC recognizes this distinction, including in its definition of security interest any "interest of a consignor" subject to Article 9 of the UCC, which governs secured transactions. R.I. Gen. Laws § 6A-1-201(37).

Case law has developed a host of factors to determine whether a purported consignment should be treated as a secured transaction. The factors coalesce around one issue: whether the parties intended the consignee to be an agent of the consignor. For example, the court in *In re Ide Jewelry*, 75 B.R. 969, 978 (Bankr. S.D.N.Y. 1987), collected authority for the following factors in favor of finding that the parties intended a security arrangement rather than a true consignment, all but the last of which point to a lack of control of the "consignor" over the "consignee":

(1) The consignee sets the price,
(2) The consignee is billed upon shipment,
(3) The consignee commingles the proceeds with other revenue and fails to keep separate accounts,
(4) The consignee mixes the consigned goods with other goods, and
(5) The consignor purports to retain title to goods until paid.

Conversely, the court collected authority for the following factors showing the intention to create a true consignment, all of which show continuing control by the consignor:

(1) The consignor sets the price at which the consignee may sell the goods,
(2) The consignee may only sell at that price,
(3) The consignor may recall the goods,
(4) The consignee receives a commission and not a profit on the sale,
(5) The consigned property is kept separate from other property of the consignee,
(6) The consignor may inspect the consignee's records and inventory, and
(7) The consignee has no obligation to pay for the goods unless they are sold.

5

*Id.* Put simply, these factors suggest that a true consignment must involve the consignee serving as an agent of the consignor. If a transaction lacks this common law element of consignment, it is treated as a security arrangement under Article 9.

Here, Aaura, not Sovereign, had control over the gold. Aaura determined to whom the inventory was sold and at what price. Aaura also bore all the risk associated with possessing the gold, such as loss, theft, damage, or destruction. In fact, Sovereign had so little control over the actual goods involved in this purported consignment that the gold Sovereign claims to own—Aaura's inventory—is different from the gold it consigned to Aaura. Although the agreement stipulates that Aaura must purchase any gold that leaves its principal office, the practice of the parties was that Aaura needed only to maintain a level of gold sufficient to collateralize its obligation. It was immaterial to the parties what gold (of defined quality) was in Aaura's inventory. By Sovereign's own admission, the gold was treated as a fungible good.[2]

Far from exercising control over the gold involved in the Consignment Agreement, Sovereign allowed Aaura to deal with the gold as its own. Since Aaura was required only to return gold or its value at the termination of the agreement, Sovereign's risk was only in the volatility of the value of gold. This, too, is consistent with Sovereign's retention of title solely as security. By entering into the agreement, Sovereign was able to participate in gold speculation while also receiving interest in the form of consignment fees, a transaction quite similar to making a loan in a foreign currency. Instead of lending yen or some other currency and requiring payment in that currency, the Consignment Agreement involved a loan denominated

---

[2] Sovereign contends that the fungible nature of the gold involved here should result in a different application of the law of consignment. There is no basis for this argument. Bailments of fungible goods have been recognized in certain contexts—grain elevators and oil pipelines—where the bailee is not required to account for the actual goods transferred by the bailor. *See Public Service Elect. & Gas Co. v. Federal Power Comm'n*, 371 F.2d 1 (3d Cir. 1967); *O'Keefe v. Equitable Trust Co.*, 103 F.2d 904 (3d Cir. 1939); *In re Fuel Oil Supply and Terminaling, Inc.*, 72 B.R. 752 (S.D.Tex. 1987), rev'd on other grounds, 837 F.2d 224 (5th Cir. 1988). However, in each of these situations, the bailor retained control over the disposition of the goods involved.

6

in gold with gold as the currency for repayment—as reflected in the fact that the "consignment" took place without the physical movement of any gold. The consigned gold was simply collateral for an obligation to return gold (or its value) on demand of Sovereign; the gold was owned by Aaura.

*The amount of Sovereign's claim.* Second, Sovereign's claim against Aaura in this bankruptcy case was fixed as of the petition date and did not increase with the rise in the price of gold. Accordingly, Aaura may rely on the increased value of the gold in its inventory to provide adequate protection of Sovereign's claim.

Specifically, Aaura had an obligation under the Consignment Agreement either to deliver 5,000 FTO of gold to Sovereign or pay the equivalent market price. Accordingly, Sovereign filed a claim under § 501 of the Bankruptcy Code for the value of 5,000 FTO of gold. At $556 per ounce, the value of the gold as of the petition date was $2,780,000.[3]

Section § 502(b) gives a clear directive as to which date and what currency are to be used in determining the amount of a disputed claim. Upon the filing of a claim objection, it requires the court to determine the amount of the claim "in lawful currency of the United States as of the date of the filing of the petition." There is some dispute whether this directive requires or allows the discounting of non-interest bearing claims to a present discounted value. *Compare In Re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir. 2006) (finding discounting impermissible) *with In re Loewan Group Int'l, Inc.*, 274 B.R. 427 (Bankr. D.Del. 2002) (requiring discounting). There is no dispute, however, that the appropriate date for determining the value of the claim is the date of the filing of the petition. *See, e.g., In re Gledhill*, 164 F.3d 1338, 1340 (10th Cir. 1999); *In re Weiman*, 22 B.R. 49, 57 (B.A.P. 9th Cir. 1982).

---

[3] This obligation was secured by Aaura's gold, inventory, and accounts receivable, according to the terms of the Security Agreement. Sovereign perfected this security interest by filing a UCC financing statement with the Illinois Secretary of State.

In fact, the issue of when to determine a claim was decided long ago, when the Supreme Court held that American bankruptcy law had adopted the "English rule" that claims in bankruptcy are "fixe[d] the moment . . . the petition is filed." *Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911). In explaining this result, Justice Holmes used the metaphor of a "pie-powder court" settling the whole matter in a single day: "[T]he secured creditor would be called upon to sell or have his security valued on the spot, would receive a dividend upon that footing, would suffer no injustice, and could not complain." *Id.* at 344-45.[4] The plain language of § 502(b) incorporates this understanding.[5] Petition date valuation is mandatory.

Sovereign seeks to evade this result by arguing that its claim should be treated under § 502(c), which allows the estimation of unliquidated claims. Courts have discretion in determining the method by which claims estimation may take place, *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135-36 (3d Cir. 1982), and Sovereign suggests that this discretion extends to choosing the date as of which claims should be valued. There are two problems with this suggestion. First, claims estimation under § 502(c) is only appropriate where liquidation under § 502(b) "would unduly delay the administration of the case." Here, liquidating the claim

---

[4] A court of "pie-powder" (or piepoudre) oversaw commercial dealings at English fairs and markets. The root is a French term for itinerant traders, who had "dusty feet" (pieds poudre). Webster's New International Dictionary 523 (3d ed. 1981).

[5] The limiting effect of § 502(b) is not inconsistent with the recovery allowed under § 506(b). Section 502(b) prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars. The amount of the claim will not change, even if the goods under contract subsequently rise or fall in value, or if the applicable currency rises or falls in relation to dollars. *Cf. Finanz AG Zurich v. Banco Economico S.A*, 192 F.3d 240, 250 (2d Cir. 1999) (noting that under United States bankruptcy law claims in a foreign currency are determined by converting them to U.S. dollars as of the date of filing of the petition). Section 506(b), on the other hand, allows creditors to recover applicable interest, fees, and costs to the extent that its claim is oversecured, but only after the collateral is sold or the bankruptcy estate is otherwise concluded. *In re Delta Resources, Inc.*, 54 F.3d 722, 730 (11th Cir.1995). The operation of § 506(b) could allow an increased claim at some later point in the bankruptcy, but that future adjustment of the claim is not subject to adequate protection during the administration of the case. *In re Addison Properties Ltd. Partnership*, 185 B.R. 766, 784 (Bankr.N.D.Ill.1995).

under § 502(b) is a simple matter of multiplication; there is no need for estimation. But second, the very authority that Sovereign cites in this connection recognizes that "[i]n estimating the value of an unliquidated claim, 'the bankruptcy court is bound by the legal rules which govern the ultimate value of the claim.'" *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir.1984) (quoting 3 Lawrence King, *Collier on Bankruptcy* ¶ 502.03 at 502-77 (15th ed. 1983)). The legal rules that govern the allowance of Sovereign's claim here include the bankruptcy requirement that the claim be valued as of the petition date. Thus, although *Brints* speaks of affirming a bankruptcy judge's "discretion" in estimating claims as of the petition date, the decision is more properly understood as requiring such valuation. *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (D. Del. 2005) (citing *Brints* for the proposition that, in an estimation, "claims are to be valued as of the petition date").

Like Sovereign, Aaura contends that the petition date should not be controlling. It asserts that each installment in its dealings with Sovereign under the Consignment Agreement—twelve in all—should be converted from gold into U.S. dollars as of the date of the transaction. This contention also fails under § 502(b). As discussed above, Aaura's obligation under the Consignment Agreement was to return gold or pay its value to Sovereign at whatever time the agreement terminated. Aaura bore the risk that the gold would increase in value over time. Section 502(b) converts Aaura's obligation to repay the obligation in gold into a claim against the estate in dollars, but it makes this transformation only as of the petition date, not retroactive to the date on which Aaura first became liable.

## Conclusion

For the reasons stated above, Sovereign's claim is allowed in the amount of $2,780,000 pursuant to Aaura's objection, and Aaura's motion for use of cash collateral is granted. Orders to this effect will be entered separately.

Dated: September 1, 2006

_____
Eugene R. Wedoff
United States Bankruptcy Judge